**Elaine M. SCHMIDT, Administratrix of the Estate of Donald M. Schmidt, Deceased, Plaintiff,**

v.

**John W. WINGO and Mrs. Carrie N. Salb, as Executrix of the Estate of Dr. Max C. Salb, Deceased, Defendants.**

**Civ. A. No. 2126.**

United States District Court, W. D. Kentucky, Paducah Division.

May 7, 1973.

Philip Taliaferro, Covington, Ky., for plaintiff.

John Breckinridge, Atty. Gen., Clem Curran, Asst. Atty. Gen., Frankfort, Ky., William B. Byrd, George R. Effinger, Paducah, Ky., Damon Vaughan, Madisonville, Ky., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

ALLEN, District Judge.

This civil rights suit is brought by the mother of Donald M. Schmidt, the deceased, in her capacity as the administratrix of his estate. The complaint seeks compensatory and punitive damages in the total amount of $200,000,

against various defendants, all of whom have been dismissed with the exception of the defendant John W. Wingo. The plaintiff and the estate of Dr. Salb reached an agreement dismissing-settled plaintiff's complaint as against the estate on the second day of the trial.

The complaint, insofar as it relates to Wingo, alleges violations of the 1st, 2nd, 4th, 8th and 14th Amendment rights of the deceased, and appears to be based factually only on the 8th and 14th Amendment rights.

The evidence shows that about 3 p. m. on August 31st, 1970, plaintiff's decedent, who will hereinafter be referred to as Schmidt, then an inmate at Eddyville State Penitentiary, 23 years of age, sustained several stab wounds from a fellow inmate. Upon the Institution finding out about the wounds, a call was made to Dr. Max C. Salb, now deceased, a physician who lived in Princeton, Kentucky, and who was employed by the Eddyville Penitentiary and defendant Wingo as a forty-hour physician. Wingo was, at all times pertinent, the Warden at Eddyville and the man upon whom devolved the ultimate responsibility for determining whether or not inmates should be removed to outside hospitals for care.

Pursuant to that call, Dr. Salb came to the Penitentiary, arriving there between 3:50 and 4 p. m. When he arrived, he found that Schmidt had numerous stab wounds which were bleeding profusely. The First Aid inmates had given him Dextran intravenously and were applying dressings in an attempt to stem the loss of blood. His clothing was completely removed and he was taken to the large surgery room. Upon removal to surgery, it was found that the blade had entered between the 7th and 8th rib on the right side of the chest, severing the intercostal artery and vein, making a rent in his liver. The second wound penetrated between the 5th and 6th rib in the mammary line puncturing the lung.

A third stab wound entered the back between the 4th and 5th rib, entering the lung, and the upper left arm was penetrated and there was a laceration in the right shoulder. After tying off the leaders in the arm and making the initial examination, Dr. Salb called defendant Wingo.

The medical records show that Morphine was given plaintiff's decedent at 3:35 p. m. for pain, and again at 7:40 p. m., and that Demerol was given him for the same purpose at 8 p. m. The first record as to a blood transfusion was at 8:15 p. m. at which time 500 cc's of blood was commenced.

The medical records also show that plaintiff's decedent's blood pressure was 110/70 at 8:30 p. m.; 110/68 at 9:30 p. m. and at 10 p. m. the transfusion of blood was discontinued. Blood pressure at 3:20 p. m. was 70/30 and at 4:30 p. m. it was 140/80. The last medical entry made by inmates who were acting as practical nurses shows that a transfusion of 1,000 cc's of Glucose and water was started at 10 p. m., and that ten minutes later plaintiff's decedent perished.

Schmidt received only a local anesthetic, as the hospital had no general anesthetic and no anesthesiologist. He suffered great pain until he expired at 10:10 p. m, on the date of his stabbing, having survived for six hours after Dr. Salb arrived.

Dr. Salb's deposition reveals that he was not a thoracic surgeon and that this fact was known to Wingo. It also appears from the record that the Penitentiary had an arrangement with the hospital at Princeton, Kentucky, some 15 miles away, for emergency care of inmates. This arrangement was apparently oral, since no written proof was furnished of it at the trial.

Dr. Salb's testimony on deposition was to the effect that he told Wingo that Schmidt should be removed to another hospital because Eddyville did not have

the necessary equipment, (page 127). Wingo asked if this equipment could be acquired immediately and Dr. Salb opined that he did not think so. The equipment needed was a ronger and a trocar. Dr. Salb then went on to say, in response to a question from Wingo, as to whether the patient could survive a trip from the Penitentiary to an outside hospital, that he could not. He considered the patient's condition too serious to be moved.

The testimony in this action is replete with defendant Wingo's assertions that he relied on Dr. Salb's medical expertise in making the decision as to whether or not to remove Schmidt to a hospital. The testimony of Dr. Salb, given in his deposition on July 14, 1971, is quite positive that in Dr. Salb's opinion, at the time he talked to Wingo, Schmidt would have died in any event regardless of whether he had been transferred to an outside hospital or not.

In addition to the testimony of Dr. Salb and Wingo, consideration has been given to testimony of Associate Warden William H. Lasley. Lasley testified that he had seen Schmidt in a very bloody condition and that he discussed with Wingo the possibility of Schmidt leaving the Institution, since Wingo would shortly go off duty and Lasley would be in command of the Penitentiary. His testimony was to the effect that Wingo stated that if the doctor was of the opinion that Schmidt should leave the hospital, then Schmidt should go outside Eddyville.

Looking at the other side of the coin, plaintiff attempted to show by the testimony of inmates and former inmates of Eddyville that Wingo had told Dr. Salb not to remove Schmidt because he was a "goddamn inmate". Each of these convict witnesses based his belief that Wingo made such a statement on the alleged statement made by Dr. Salb in response to a question by one of the inmates during the early hours of Schmidt's agony

as to whether or not he would be removed from the hospital. These witnesses testified that they were of the impression that Dr. Salb, when he uttered these curse words, was merely reiterating what he had heard over the telephone from Wingo.

█ In addition, plaintiff introduced a Reverend Inman, who had been chaplain at Eddyville at the time of the fatal stabbing and who testified to the same effect as the inmates did. The Court allowed the introduction of most of this testimony at a time when Dr. Salb's estate was still a party to the action. The testimony could only have been received as against Dr. Salb's estate in any event, since Wingo was not present and did not hear the statement which is attributed to have been made by Dr. Salb. Under both Kentucky and federal rules of evidence, the testimony of Rev. Inman and the inmates as to what Dr. Salb said is plainly inadmissible. See the cases cited under Evidence § 317(18), Modern Federal Practice Digest and § 317(18), Kentucky Digest. The same principle is, of course, applicable to the interview between Dr. Salb and some of the attorneys in the case.

Dr. Don Wright testified to the effect that in his opinion Dr. Salb was guilty of medical malpractice in not insisting in his conversation with Wingo that the latter require that the plaintiff's decedent be transported to an outside hospital, where a general anesthetic could be had, thoracic equipment provided, and possibly a thoracic surgeon. However, Dr. Wright made no pretense of knowing anything about Dr. Salb's conversations with Wingo and his testimony was directed solely to the claim of medical malpractice against the estate of Dr. Salb.

In connection with the outside facilities to which it is contended that Wingo should have required Schmidt to be taken, it was shown that approximately a one hour round-trip would have been required between Princeton and Eddyville,

and that a round-trip of approximately one and one-half to two hours would have been required to get to Madisonville under optimum circumstances. It was not shown specifically that Princeton had a thoracic surgeon available, although Dr. N. H. Talley, located in that city, is engaged in the general surgery field. Princeton did have general anesthetic facilities as well as the trocar and ronger.

■ It is pointed out in Coppinger v. Townsend, 398 F.2d 392 (10th Cir. 1968) that there is a conflict between the circuits as to whether improper medical care is a denial of federal right. It is inferred there that a claim of denial of total medical care would be sufficient to state a cause of action under the Civil Rights Act. In the absence of opinions from the Sixth Circuit Court of Appeals, this Court follows the rule set out in the Ninth Circuit, which is as follows:

Stiltner v. Rhay, 371 F.2d 420 (9th Cir. 1967)

1. Acute physical condition;

2. The urgent need for medical care;

3. The failure or refusal to provide it; and

4. Tangible residual injury.

■ The Court follows also the rule set out in Mayfield v. Craven, 299 F. Supp. 1111 (D.C.E.D.Calif.1969) that medical personnel may be liable for medical treatment of prisoners when it is so obviously inadequate as to amount to a refusal of urgently needed care, or so obviously improper as to evidence a design to aggravate the prisoner's condition.

■ The above principles, by their language, are confined to medical personnel who are employees of a state institution, although the cases themselves indicate that Warden defendants, as well as medical personnel, are treated in the same category for the purposes of testing the pleadings on motions to dismiss. It is this Court's opinion that as to the Warden, plaintiff must show by a preponderance of the proof a deliberate refusal to follow the recommendation of Dr. Salb. Since Dr. Salb did not give a recommendation that plaintiff's decedent be removed to an outside hospital, the Court concludes that the plaintiff has failed to meet her burden of proof and, therefore, her complaint must be dismissed.

■ The Court is not unmindful of the contentions of the plaintiff that the equipment and personnel for the medical care of an inmate at Eddyville, who had suffered such severe wounds as plaintiff's decedent did in this case, were entirely inadequate. However, it is not believed that it was the intention of the framers of the Civil Rights Act to place liability upon the Warden of a penitentiary for the failure to furnish such equipment and personnel, where the budget for personnel and equipment are fixed by his superiors, the Department of Corrections and by the General Assembly of the State of Kentucky.

■ The Court believes that the responsibility of the Warden is to render such medical care as is available at the institution, under the circumstances, and that only when he refuses to render that care should he be held liable for violations of the Civil Rights Act. It is, of course, devoutly to be hoped that provisions have been made since the tragic death in 1969 of plaintiff's decedent for an upgrading of equipment and for a firm arrangement for the provision of such medical aid as may be needed in emergencies, recognizing, of course, that it is not the duty of the Penitentiary to have on permanent hire a thoracic surgeon, or a general anesthesiologist.

A Judgment is entered herewith.